UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHARLES MOORE; et al.,

  Plaintiffs,

  v.

THORNWATER COMPANY LP, a foreign limited partnership; et al.,

  Defendants.

CASE NO. C01-1944C

ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 172), Plaintiffs' Opposition (Dkt. No. 175), and Defendants' Reply (Dkt. No. 178). Having considered the papers submitted by the parties and finding oral argument unnecessary, the Court finds and rules as follows.

**I.    BACKGROUND**

In June 1997, Charles and Ann Moore opened a securities brokerage account with the Thornwater Company, a New York limited partnership that operates a broker-dealer business. Working with their Thornwater Account Executive Jason Meyers, the Moores engaged in a variety of securities transactions from June 1997 through 2001, which resulted in significant investment losses and commission expenses. In a second amended complaint, the Moores alleged several claims under federal

ORDER – 1

and state law, including churning, negligent misrepresentation, breach of fiduciary duties, breach of duty to supervise, breach of contract regarding margin calls, and violations of the Washington State Consumer Protection Act ("CPA") and the Washington State Securities Act ("WSSA").  The WSSA claim at issue here involved Thornwater's sale of an investment in Lanesborough Holdings LLC to Plaintiffs.  The "Lanesborough Holdings" transaction involved a private offering of a nontransferable interest in a high-risk venture that apparently "finance[d] [Defendant] Thornwater in some way."  (Pls.' Opp'n, Kinsel Decl. 109 (Direct Examination of Jason Meyers 368:11).)

The case was tried before a jury from June 9 through June 13, 2003.  The jury returned a special verdict form (*see* Dkt. No. 114) finding that Plaintiffs' account was not churned under either federal or state law, that Defendant Meyers did not engage in common law negligent misrepresentation in the sale of interest of Lanesborough Holdings, and that Defendant Meyers did not breach an oral contract to warn Plaintiffs about margin calls.  However, the jury concluded that Thornwater was a control person with respect to Meyers, *that Meyers violated the WSSA in the sale of interest in Lanesborough Holdings*, that Defendants breached their fiduciary duties owed to Plaintiffs, that Thornwater breached a duty to supervise Meyers, and that Defendants violated the Washington State CPA.

Relevant to the instant remand, among other damages awards, the jury returned a damages award for violation of the WSSA in the sale of Lanesborough Holdings of $30,000 plus interest and reasonable attorney fees and costs.  After deliberating further, it crossed out its award for interest and reasonable attorney fees and costs and awarded $35,000.  Among many post-trial motions by both parties, Defendants moved for a judgment notwithstanding the verdict or a new trial on the claim of fraud under the WSSA.

This Court ordered a remittitur regarding the WSSA damages award in an Order dated July 30, 2003 (Dkt. No. 124).  The remittitur changed the WSSA award from $35,000 to $30,000 because the jury incorrectly thought it needed to add interest and reasonable attorney fees and costs to its award.  This Court found that the jury's crossing out of the original number to add $5,000 was a clear attempt to

ORDER – 2

1  award attorney fees and costs. Despite the improper addition of that $5,000, this Court found that the
2  original $30,000 award was supported by the evidence, and therefore that the proper remedy for
3  excessive damages was to reduce the award rather than grant Defendants a new trial on that issue. The
4  denial of Defendants' motion for a new trial was conditioned on Plaintiffs' acceptance of the remittitur.
5  On August 18, 2003, Plaintiffs accepted the Court's remittitur of the jury's verdict on the Lanesborough
6  Holdings claim from $35,000 to $30,000.

7        This Court entered an Order of Judgment on December 8, 2003 (Dkt. No. 153) for $30,000 for
8  the Lanesborough Holdings claim, $50,000 for breach of duty to supervise, $75,000 for violation of the
9  CPA, and $16,706.75 for breach of fiduciary duty. This totaled $121,706.75 in principle damages, plus
10 prejudgment interest on $30,000 at 8% per annum to accrue from September 13, 1999 to the date of
11 entry of judgment, $49,660 in attorney's fees, and $1,061.33 in costs to be awarded jointly and severally
12 against Defendants Thornwater and Meyers. The award of $50,000 in principle damages was entered
13 against Defendant Thornwater alone.

14       Following the judgment, Defendant Thornwater appealed this Court's denial of its request for a
15 remittitur to zero damages on Plaintiffs' failure-to-supervise claim. Defendants Thornwater and Meyers
16 also appealed this Court's denial of their motion for a judgment notwithstanding the verdict or a new trial
17 on Plaintiffs' WSSA claim. (*See* Notice of Appeal (Dkt. No. 155)); *Moore v. Thornwater Co., LP*, No.
18 04-35017, 155 Fed. Appx. 257 (9th Cir. 2005) (unpublished Memorandum and Order). The Ninth
19 Circuit affirmed the Court's decision not to alter the failure-to-supervise jury awards, but remanded the
20 WSSA claim for reconsideration in light of new caselaw handed down after this Court's
21 judgment—*Stewart v. Estate of Steiner*, 93 P.3d 919 (Wash. App. 2004), *review denied* 108 P.3d 1229
22 (Wash. 2005). (*See* Judgment and Mandate (Dkt. No. 164) subsequent to *Moore*, 155 Fed. Appx. 257.)
23 The parties stipulated to briefing the instant motion on remand.

24 //
25 //
26 ORDER – 3

## II. ANALYSIS

### A. Legal Standard

The parties dispute the proper standard to be utilized in determining the instant motion. The Ninth Circuit remanded Defendants' motion for judgment notwithstanding the verdict ("JNOV") or a new trial. The parties then agreed to proceed on remand with Defendants' filing of a motion for summary judgment. Plaintiffs now argue that despite the styling of Defendants' motion as one for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), the instant motion should be considered under the directed verdict or JNOV standard. (*See* Pls.' Opp'n 5–8.) As Plaintiffs emphasize, a summary judgment motion typically occurs before trial, whereas a directed verdict or JNOV occurs after presentation of evidence or after a jury has returned a verdict. Here, a trial has already occurred and the procedural posture is that of a remand, not that of a typical summary judgment motion.

While the summary judgment inquiry generally seeks to determine whether there is a genuine issue of fact for trial, the directed verdict or JNOV inquiry hinges on whether there is substantial evidence to support a verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (summary judgment); *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (directed verdict or JNOV). The primary difference, however, is the developmental stage of the record, *not* the substantive inquiry. The summary judgment standard actually "mirrors the standard for a directed verdict." *Anderson*, 477 U.S. at 250. Fundamentally, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Accordingly, the Court acknowledges that a voluminous record exists in this case and finds that the proper standard is to determine whether one side is entitled to a judgment as a matter of law.

//
//
//

ORDER – 4

**B.     Reasonable Reliance**

The WSSA claim at issue here was based on the following Washington statute and administrative rule.

> It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
> (1) To employ any device, scheme, or artifice to defraud;
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

WASH. REV. CODE § 21.20.010. The related administrative rule defines terms used in the statute:

> A broker-dealer who engages in one or more of the following practices shall be deemed to have engaged in an 'act, practice, or course of business which operates or would operate as a fraud' as used in RCW 21.20.010. This section is not intended to be all inclusive, and thus, acts or practices not enumerated herein may also be deemed fraudulent.
> . . . .
> (2) Contradicting or negating the importance of any information contained in a prospectus or other offering materials with intent to deceive or mislead or using any advertising or sales presentation in a deceptive or misleading manner.

WASH. ADMIN. CODE 460-21B-008.

To establish a statutory violation under section 21.20.010(2) of the Washington Revised Code, the jury was instructed that the Plaintiffs had to show (1) that "Jason Meyers represented to Charles Moore that the Lanesborough Holdings could be resold by Mr. Moore if he wished to do so"; (2) that "this representation was material"; and (3) that "Charles Moore relied on this misrepresentation when making his decision to purchase the Lanesborough Holdings security." (Defs.' Mot., Altman Decl. Ex. A (Trial Transcript 567:16–568:1).) The jury was further instructed that Plaintiffs did not have to "show that this misrepresentation was the proximate reason for the decline in value of the Lanesborough Holdings security" and that a "material fact for purposes of R.C.W. 21.20.010 is a fact to which a reasonable person would attach importance in determining his or her choice of action in the transaction in question." (*Id.* (Trial Transcript 568:2–8).) The Court also read to the jury the administrative rule definition of "act, practice, or course of business which operates or would operate as a fraud," quoted

ORDER – 5

*supra* (WASH. ADMIN. CODE 460-21B-008(2)).  (*Id.* (Trial Transcript 568:9–17).)

The following facts are relevant to Plaintiffs' proof of the WSSA violation.  Plaintiffs' investment in Lanesborough Holdings developed after Defendant Meyers (a partner in Defendant Thornwater) solicited[1] Plaintiff Charles Moore regarding the venture.  (*See* Pls.' Opp'n, Kinsel Decl. 54–57 (Direct Examination of Charles Moore 144–147).)  The exchange included Meyers sending a subscription agreement to Moore for review.  Among other cautionary language, the agreement stated that

> THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

(Defs.' Mot., Altman Decl. Ex. H (Lanesborough Holdings LLC Subscription Agreement 3).)  Further, the subscription agreement contained the following clause:

> (j) (I) The Subscriber is fully aware that an investment in the LLC involves significant risks which he may have to bear for an indefinite period of time because, (i) the LLC has no operating history; (ii) there will be no public market for the units; (iii) transfer of the Units is subject to restrictions contained in the Operating Agreement; (iv) the Units have not been registered under the Securities Act of 1933 ("the 33 Act") or under the securities laws of any state and, therefore, cannot be resold unless they are subsequently so registered or an exemption from such registration is available; (v) the LLC is not required to, and does not intend to, register any of the Units for resale under the 33 Act or any state securities laws; and (vi) he is acquiring the Units for investment and not with a view to resale or distribution thereof.

(*Id.* (Lanesborough Holdings LLC Subscription Agreement 8).)

After reviewing the documents containing this language, Moore determined that he was not interested in participating in Lanesborough Holdings because it was illiquid—meaning that an interest therein could not be sold because there was no market for it.  According to Moore's testimony, after

---

[1] A "solicited" order is one where the trader approaches the buyer on a cold call, asking the buyer to consider a particular investment.  An "unsolicited" order is one where the buyer approaches the trader seeking to engage in a particular transaction.  (*See* Pls.' Opp'n, Kinsel Decl. 19 (Direct Examination of Charles Moore 78:18–21).)

ORDER – 6

1  Moore told Meyers that he was not interested in the illiquid Lanesborough Holdings investment, Meyers

2  responded that "even though it purported to be not liquid and whatnot, that [Meyers] could get some of

3  the other partners at any time to buy my one-fifth share unit." (*Id.* at 56 (Direct Examination of Charles

4  Moore 146:21–23).) In addition, the following exchange took place during Plaintiff Charles Moore's

5  direct examination at trial:

> Q: Was Mr. Meyers'[s] representation to you regarding his ability to find someone to buy your interest in Lanesborough Holdings important to your decision to buy that security?
> A: Well, it was paramount.
> Q: And when you say "paramount," what do you mean?
> A: Well, I mean I would not subscribe to it unless he said he could sell it.
> Q: And, again, why did you find his statement that he could sell it for you credible?
> A: Well, I wouldn't have thought he would have lied to me.

*Id.* at 57 (Direct Examination of Charles Moore 147:12–21). In contrast, Meyers's testimony at trial was that he did not tell Moore that the Lanesborough Holdings interest could be sold. (*Id.* at 108 (Direct Examination of Jason Meyers 367:16–19).) Of course, the jury found Moore's testimony more credible on this point, returning a verdict that Meyers did violate section 21.20.010(2) of the Washington Revised Code, an element of which is that Meyers represented Moore that the Lanesborough Holdings could be resold by Moore if he wished to do so.

Not only did the jury believe that Meyers *made* this representation, the verdict required that the jury also find that Meyers's misrepresentation was *material* and that Moore *relied* on it when he purchased an interest in Lanesborough Holdings. Those elements having been established, the Ninth Circuit has now instructed this Court to consider whether Plaintiff Charles Moore *reasonably* relied on oral representations made by Defendant Jason Meyers in conjunction with the sale of Lanesborough Holdings, in light of the decision in *Stewart*. Specifically, this Court must consider whether Moore's reliance on Meyers's oral representations described *supra* was reasonable, despite his subsequent signature on the subscription agreement, which contained the following "nonreliance" language:

> (f) . . . . [T]he only information upon which the undersigned has relied is that set forth in the Disclosure Materials. The undersigned acknowledges that the undersigned has received no representations or warranties from the LLC, the Managing Member or any

ORDER – 7

other person or entity in making this investment decision other than as set forth in the Disclosure Materials.

(Defs.' Mot., Altman Decl. Ex. H (Lanesborough Holdings LLC Subscription Agreement 7–8).)

The *Stewart* decision marked the first time that a Washington court had discussed the reasonableness of reliance in a securities fraud case where the oral representations upon which the plaintiff relied were contradicted by written materials signed by the plaintiff that included such a "nonreliance clause." 93 P.3d at 924. Thus, as in the instant case, the *Stewart* plaintiff brought a WSSA claim arising out of a securities transaction that involved a written "nonreliance" clause warranting that the purchaser "relied solely on a written offering memorandum and did not rely on any oral representations in making his investment decision." *Id.* at 261.

Before proceeding to the reasonableness inquiry, the Court notes that the Ninth Circuit's opinion remanding the instant case cites *Hines v. Data Line Systems, Inc.*, 787 P.2d 8 (Wash. 1990), for the proposition that securities fraud under Washington law, including that under Washington Administrative Code 460-21B-008(2), requires plaintiffs to "show reasonable reliance." *Moore*, 155 Fed. Appx. at 258. However, *Hines* discusses neither *reasonable* reliance nor Washington Administrative Code 460-21B-008(2). Instead, *Hines* discusses the *materiality* of misrepresentations as an element of a securities fraud claim. 787 P.2d at 12–13. Therefore, all that the cited text of *Hines* supports is the notion that both elements of (1) materiality of the misrepresentation and (2) reliance must be shown. *Id.* at 12 ("The investors need only show that the misrepresentations were material and that they relied on the misrepresentations in connection with the sale of the securities."). The materiality of Meyers's misrepresentation is not at issue here. Rather, the issue is whether Moore's reliance thereon was reasonable.

While *Hines* is irrelevant to the reasonableness inquiry, *reasonable* reliance is expressly discussed as an element of securities fraud in the *Stewart* opinion. In *Stewart*, the Washington Court of Appeals specifically stated that "*reasonable* reliance," not "mere reliance" is required to establish a WSSA

ORDER – 8

violation. 93 P.3d at 923 n.9. In supporting this distinction, however, even the *Stewart* court conflated the reliance element with the materiality-of-misrepresentation element, citing *Clausing v. DeHart*, 515 P.2d 982 (Wash. 1973), for that court's adoption of the definition of a "material fact" as one that a "*reasonable* [person] would attach importance in determining [his/her] choice of action in the transaction in question." *Stewart*, 93 P.3d at 923 n.9 (alterations in original). Despite these courts' confusion of the matter, this Court nevertheless acknowledges that reliance must be reasonable to prove a WSSA violation, and the test for such reasonableness is that outlined in *Stewart*.

The *Stewart* court adopted a factor test that a Court should apply when making the reasonableness determination. Significantly, however, before reaching the factor test, the *Stewart* court acknowledged that Washington's "securities laws are to be interpreted liberally to achieve the desired effect of protecting investors" and found that "the fact that one signs a non-reliance provision in a subscription agreement is not necessarily dispositive." *Id.* at 927. "Rather, it is appropriate to consider other relevant factors in making a determination whether one reasonably relies on representations or omissions in connection with the sale of a security." *Id.*

The "reasonableness" factors to be considered include:

(1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.* (citing *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416 (1st Cir. 1989)). None of these factors is alone dispositive. *Id.* Further, the *Stewart* court held that these factors may be examined and resolved on summary judgment. *Id.* This finding is particularly relevant here, where this Court has the benefit of a developed trial record and findings of the jury that reflect the weight that the jury must have put on various evidence in order to return its verdict. The Court now turns to the factor test.

//

ORDER – 9

The *Stewart* court ultimately determined that the plaintiff in that case had *not* reasonably relied on oral misrepresentations. In making this finding, the *Stewart* court found unconvincing the plaintiff's argument that he believed that the fund documents were merely the official source of information but that he reasonably relied on contradictory oral representations. 93 P.3d at 926. In applying the factor test, the *Stewart* court found that the plaintiff was a sophisticated investor. Further, there was no longstanding business or personal relationship between the broker and the plaintiff, where the plaintiff and the broker were not then in a broker–client relationship outside of the investment in question. The *Stewart* court acknowledged that the plaintiff there might not have had access to information about the misrepresentations and that the fraud may have been concealed, but dismissed these as nondispositive even if they were determined in the plaintiff's favor. Finally, it was unclear whether the plaintiff tried to expedite the transaction. *See generally id.* at 927 (applying the factor test).

*Stewart* is similar to the instant case in that the plaintiff there invested in a "high risk" investment for which he was solicited by his broker. 93 P.3d at 261–62. Also, as in *Stewart*, Moore is a sophisticated investor with experience in the financial market, a characteristic that works against him as to the first factor of the *Stewart* test.

There are several significant differences between the *Stewart* plaintiff and Moore, however. Among them is that the relationship between Moore and Meyers appears to be much more developed and longstanding than the broker–client relationship in *Stewart*. The multiple-year trading history between Moore and Meyers goes to the second factor, working in Moore's favor. As a result of their ongoing relationship, Meyers had gained Moore's trust, and as Moore's testimony reveals, Moore expected Meyers to be candid and honest with him.

A second contrast between the two cases is that, in *Stewart*, the oral statements were regarding the riskiness of the investment itself. *Id.* at 262. Here, however, the statements by Meyers involved whether the Lanesborough Holdings' illiquidity was as sure as it seemed based on the offering materials. This contrast is significant in considering the third, fifth, and sixth *Stewart* factors, all of which relate to

ORDER – 10

Moore's opportunity to detect the truth in light of Meyers's concealment thereof.

Specifically, Meyers was one of the partners in Thornwater, the entity that would be benefitting from the Lanesborough Holdings investment. Meyers was clearly an insider with respect to the business dealings of Thornwater because he was a partner, and in asserting that another partner would buy Moore's share if he wanted to sell, Meyers left little room for Moore to verify such a claim. The implication was that though there was no *real* market for resale of this investment, there was a *functional* market among the partners—a sort of unofficial forum where Moore could later sell his interest in Lanesborough Holdings despite language to the contrary in the subscription agreement. This is exactly the type representation that one would not expect to see in written materials, and, in this regard, the very contradiction between Meyers's oral representations and the written materials is unremarkable.

In *Stewart*, however, the investment supposedly was not risky anymore because it was fully funded. Rather than investing in the financing of the venture, the *Stewart* plaintiff thought he was investing in shares that carried much less risk. The contradiction in the instant case relating to liquidity is distinguishable from the one in *Stewart* about the general riskiness of the investment, in part because riskiness likely is verifiable from a more objective source. Furthermore, according to the *Stewart* court, the plaintiff's potential lack of access to the truth about how much risk his investment carried was not deemed significant.

This Court cannot so find with respect to Moore's access to the truth about Meyers's misrepresentation. Indeed, the very nature of Meyers's misrepresentation was that he was implying that a side deal was possible and that Moore should simply ignore the stark language in the subscription agreement on that precise point. The Court therefore finds the character of Meyers's misrepresentation to be highly significant in applying the factor test, such that the third, fifth, and sixth factors work in Moore's favor.

A related difference between the instant case and *Stewart* is that the *Stewart* opinion does not address Washington Administrative Rule 460-21B-008, on which the jury in the instant case was

ORDER – 11

instructed.  This is important in applying the fifth *Stewart* factor—concealment of fraud.  In finding liability, the jury must have believed that Meyers "contradict[ed] or negat[ed] the importance of . . . information contained in . . . [the] offering materials with intent to deceive or mislead" Moore.  In contrast, the *Stewart* court found that it simply did not have enough information to make such a finding there, and, even if it assumed such a fact in the light most favorable to the plaintiff, it would not consider that factor dispositive.  This Court need not deem the jury instruction on Washington Administrative Rule 460-21B-008(2) dispositive to find that it works in Moore's favor.  Furthermore, unlike the *Stewart* court, this Court does not have to guess about whether there was concealment of the fraud or assume that fact in the light most favorable to Moore.  The jury has already decided that issue of fact, and this Court will not disturb or contradict the jury's verdict in that regard.

As to the seventh *Stewart* factor, it is clear that Moore did *not* initiate the transaction at issue here.  While the record does not speak to whether he expedited it, the record does verify Moore's reservations about the illiquidity of the asset, which were assuaged by Meyers's assurances of unofficial liquidity.  The Court therefore finds that this factor likely works in Moore's favor.

Finally, as to the eighth *Stewart* factor, the misrepresentations at issue here appear to be quite specific, showing that Moore plucked particular language out of the 20-page subscription agreement about which to raise his concerns with Meyers.  Meyers pointedly contradicted that language.  Again, this factor works in Moore's favor.

While none of the *Stewart* factors discussed above is alone dispositive, the Court finds that, on balance, the combination of the factors working in Moore's favor sufficiently outweighs the written "nonreliance" clause in the Lanesborough Holdings subscription agreement.  The *Stewart* court explicitly held that signing such a clause is *not necessarily dispositive*.  Accordingly, after having fully considered the factors going to reasonableness, the Court finds that Moore's reliance on Meyers's oral misrepresentations about the liquidity of the Lanesborough Holdings investment was reasonable notwithstanding his signature on a document expressing nonreliance on oral misrepresentations.

ORDER – 12

### III. CONCLUSION

For the foregoing reasons, the Court finds Plaintiff Moore's established reliance on Defendant Meyers's established misrepresentation of a material fact in the sale of interest in Lanesborough Holdings to be reasonable under the *Stewart* factor test. Accordingly, Defendants' Motion is DENIED, Plaintiffs are entitled to judgment as a matter of law, and the jury's verdict on the Lanesborough Holdings WSSA claim is reaffirmed.

Plaintiffs are granted leave to submit a motion for additional attorney fees and costs before entry of a final judgment on the Lanesborough Holdings claim. Plaintiffs are further directed to submit a proposed final judgment in this matter. Defendants may respond to the motion and the proposed final judgment. Plaintiffs may thereafter reply.

SO ORDERED this 23rd day of May, 2006.

John C. Coughenour
United States District Judge

ORDER – 13